Delfrieda JONES, Plaintiff,

v.

**CITY OF MOUNT VERNON; City of Mount Vernon Department of Public Safety, Bureau of Police; and City of Mount Vernon, Civil Service Commission; Defendants.**

No. 99 Civ. 1476 WCC.

United States District Court, S.D. New York.

Sept. 27, 2000.

Goodstein & West, New Rochelle, NY, Robert David Goodstein, of counsel, for plaintiff.

Rains & Pogrebin, P.C., Mineola, NY, Ernest R. Stolzer, Mark N. Reinharz, Julie A. Torrey, of counsel, for defendants.

**OPINION AND ORDER**

WILLIAM C. CONNER, Senior District Judge.

Plaintiff Delfrieda Jones brings this action against defendants the City of Mount Vernon (the "City"), and the Mount Vernon Department of Public Safety, Bureau of Police and Civil Service Commission pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* and the New York State Human Rights Law, N.Y.Exec.Law § 290 *et seq.* Plaintiff claims that she was not hired as a police officer by the City because of her sex.[1] This Court conducted a two-day bench trial on June 19 and June 20, 2000, and now sets forth its findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a). For the reasons discussed below, we enter judgment in favor of defendants on all claims.

**FINDINGS OF FACT**

In a document entitled "Examination," the Mount Vernon Civil Service Commission (the "Commission") announced that Examination No. 66–487 for the position of police officer would take place on October 29, 1983. (Defs.Ex.A.) On September 9, 1983, plaintiff completed an "Application for Examination for Employment" for the position of police officer and submitted it to the Commission for processing. (Pl.Ex. 1; Defs.Ex. B.)

Two staff members, Rita Roque and Lavinia Hodgins, oversaw the day-to-day operations of the Commission. Members of the Commission came into the office at least twice a month for meetings. (Tr. 35, 160–61.) Roque has been the secretary to the Commission since 1978, (Tr. 160), and Hodgins has been the senior typist since 1977. (Tr. 35.) Roque's and Hodgins' job duties include typing civil service examination notices, making certain types of medical and psychological examination ap-

---

1. Plaintiff's complaint also included a cause of action for discrimination based on disability pursuant to N.Y.Exec.Law § 290 *et seq.* However, plaintiff did not pursue this claim at trial.

pointments for applicants, reviewing the paperwork submitted by applicants and physicians, and generally performing all of the clerical functions associated with processing civil service applications. (Tr. 36, 161.) Roque testified that in the last twenty years, she and Hodgins have processed thousands of applications. (Tr. 161.)

Plaintiff took the written Civil Service Examination on October 29, 1983, and a physical agility test on April 7,1984. She received a letter from Roque dated May 22, 1984 notifying her that her final examination rating was seventy-three percent and that she was number thirty-five on the "eligible list" for Mount Vernon residents. (Pl.Ex. 2; Defs.Ex. C.) The letter informed plaintiff that the duration of the eligibility list was two years "unless it is exhausted prior to that date." (*Id.*)

In a letter dated August 12, 1985, plaintiff was notified that she should appear at the Mount Vernon Neighborhood Health Center for medical testing related to her application for employment as a City police officer. (Pl.Ex. 5; Defs.Ex. E.) On August 30, 1985, plaintiff submitted to the medical tests required of all applicants, including measurement of her height and weight. (Pl.Ex. 6; Defs.Ex. F.)

At the time plaintiff sought employment with the City, the police department utilized the height/weight standards promulgated by the New York State Division of Criminal Justice Services, Municipal Police Training Council (the "Municipal Training Council"). (Pl.Exs. 11, 12; Defs.Ex. D.) The height/weight standards are set forth in a chart in a manual developed by the Municipal Training Council. (*Id.*) The manual states that if the weight of an applicant is within twelve percent of the upper weight limit set forth on the table for the applicant's height and body frame, it will be deemed acceptable. (Defs.Ex. D at 5.) However, if the weight of the applicant is more than twelve percent over the maximum weight:

> the candidate may, at his option and at his own expense, have further fitness and stress tests performed on him so that he can present the examining physician with evidence of his fitness in spite of his failure to meet the weight standard. If the candidate has such tests performed by an appropriate expert, the results of those tests should be presented to the examining physician who then may certify the candidate for appointment if he asserts in his medical opinion that the candidate is fit and can perform the necessary physical duties of a police officer.

(*Id.*)

The Commission was charged with checking the medical reports issued by the physicians who performed the medical examinations of the applicants. Using a checklist supplied by New York State, Roque or Hodgins would check the data on the medical forms against the various requirements for police officer candidates. Hodgins testified that she would check the weight of the applicants against the forms supplied by New York State, adding twelve percent to the maximum, to ensure that the applicant met the guidelines. (Tr. 41–42.) Hodgins said that she would "usually" check the applicant's weight against the height/weight ratio even if the examining physician had indicated on the applicant's medical examination form that the applicant met the weight standard. (Tr. 42.)

Plaintiff's medical examination report stated that plaintiff was "mildly overweight (about 12 pounds)," (Pl.Ex. 6; Defs. Ex. F), and a box was checked on the form indicating that plaintiff met the physical fitness standards required by New York State. The form also stated that plaintiff "is on a strict low calorie diet" and that her weight "defects" were "remediable." (*Id.*) Plaintiff was recorded as being five feet, five and one-half inches tall and 170 pounds with a medium frame. (*Id.*)

Hodgins testified that the physician who examined plaintiff "was wrong" when he checked the box on the form stating that plaintiff met the Municipal Training Coun-

cil's physical fitness requirements. (Tr. 79.) Plaintiff was informed by a letter from the Commission dated September 9, 1985 that she was ineligible for appointment to the position of police officer as her weight exceeded the maximum weight for applicants of her height by fifteen pounds, but that if she lost the weight she would be reconsidered at that time. (Pl.Ex. 7; Defs.Ex. H.)

The parties stipulated at trial that "every applicant on that [Civil Service] list and on other [Civil Service] lists received a letter comparable to that which the plaintiff received, notifying him that he did not meet the weight requirements and not notifying him of the alternative of the stress test." (Tr. 49.) Plaintiff's medical examination form, which plaintiff signed, stated that "[i]f weight is over or under the acceptable weight shown in the tables by an excess of 12%, attach results of additional stress and fitness tests pursuant to page 5 of the standards." (Pl.Ex. 6; Defs.Ex. F.) Plaintiff testified that she read that portion of the form before signing the document. Plaintiff testified as follows:

Q. ... That [Pl.Ex. 6; Defs.Ex. F] was a document you read before you signed it?
A. Yes.
Q. And you read that portion of the document?
A. I'm pretty sure I did.
Q. Did you ask anyone about the stress test that was mentioned in this document?
A. No.

(Tr. 17.)

Plaintiff testified that after she received the letter in September, she did not ask anyone at the Commission about the option of taking a stress test, nor did anyone from the Commission inform her of the alternative of taking a stress test. (Tr. 9, 19.) Before the expiration of the eligibility list, plaintiff orally informed the Commission that she had lost ten pounds. As a result, the Commission scheduled her for additional medical tests. (Tr. 9–11.) Plaintiff submitted to additional medical testing at the Mount Vernon Hospital, Pulmonary Function Lab. The tests indicated that plaintiff weighed 165 pounds—still over the maximum weight allowed under the requirements set by the Municipal Training Council. (Defs.Ex.I.)

The parties stipulated at trial that the civil service eligibility list based upon test No. 66–487, the test plaintiff took, expired on May 21, 1986. (Tr. 46.) At the time the list expired, plaintiff still weighed more than the maximum weight for her height allowed by the Municipal Training Council. (Tr. 18.)

As stated above, under the existing rules promulgated by the Municipal Training Council, applicants who were overweight could nevertheless be considered for appointment if they opted to take a stress test at their own cost. The City did not pay for the stress test of any applicant who took one. (Defs.Ex. D; Tr. 68.) However, plaintiff introduced evidence that several male officers, most from other eligibility lists, were hired after submitting to a stress test.

Only one individual who took the same Civil Service Examination as plaintiff on October 29, 1983 and was found to be overweight took a stress test at his own cost. In March 1985, Robin Martin underwent a physical examination in which the physician noted that he had "obesity" and "moderately elevated blood pressure." (Pl.Ex.14.) Martin was notified by letter that he was not eligible for appointment to the position of police officer because he was eighty-six pounds over the maximum weight allowable for his height. (*Id.*) Like plaintiff, Martin was told to contact the Commission when he lost the required weight. Hodgins and Roque both testified that they did not notify Martin of the stress test option. (Pl.Ex. 15; Defs.Ex. M; Tr. 63, 162–63.) Martin subsequently underwent a stress test and was certified for consideration for appointment. (Tr. 62, 162–63.) Plaintiff offered no evidence that Martin had been notified of the stress

test option by anyone at the Commission or the Mount Vernon Police Department.

█ Testimony was introduced at trial that several other individuals who took the Civil Service Examination before and after plaintiff did submitted to stress tests on their own and provided the results to the Commission.[2]

Theresa Refino, a female, took the Civil Service Examination in November of 1981. (Defs.Ex. N.) Refino was found to be five feet, two inches tall and 150 pounds. It was determined that Refino was overweight under the Municipal Training Council guidelines. (Defs.Ex. N; Tr. 63.) Refino underwent a stress test on August 30, 1982. Her physician concluded that she had "[g]ood conditioning with negative stress test for cardiovascular disability." (Defs.Ex. N.) Refino submitted those results to the Commission and was appointed to the position of police officer. (Tr. 64.)

Joseph Radzinski took the Civil Service Examination in December 1985. (Pl.Ex. 20; Defs.Ex. P.) At six feet, one inch tall and 231 pounds, Radzinski was found to be overweight under the Municipal Training Council guidelines. (Id.) In April 1987, Radzinski submitted to a stress test, the results of which were normal. (Id.) Radzinski was hired by the City as a police officer in June 1987. (Tr. 177.)

Radzinski testified regarding the stress test as follows:

Q. And how did you know about this stress test option?

A. I knew about it from the City of New York Police Department.

Q. And how did you become aware of it from the City of New York Police Department?

A. When I got hired there, I think I had to go for a stress test, also.

***

Q. Now, were you told by anyone in the City of Mt. Vernon Police Department about the stress test option?

A. No.

(Tr. 179–80.)

Pascal Storino took the Civil Service Examination in July 1985. (Pl.Ex. 21; Defs.Ex. Q.) At five feet, ten inches tall and 229 pounds, Storino was determined to be overweight under the Municipal Training Council guidelines. (Id.) Storino submitted to a stress test on January 22, 1986. The results of the stress test were normal and Storino was appointed as a City police officer in February 1986. (Id.)

Matthew Lombardo took the Civil Service Examination for police officer applicants in December 1987. (Defs.Ex.O.) Lombardo, at five feet, eight inches tall and 214 pounds, was found to be overweight under the guidelines. (Pl.Ex. 23; Defs.Ex. O.) Lombardo underwent a stress test at his own expense in November 1984. The results of the stress test were reported to the Commission's examining physician who determined that Lombardo's working capacity was average for his age group, although he had a "hypertensive response to exercise." (Id.) The examining physician submitted a note to the Com-

2. At trial, defendants objected to the introduction into evidence of information as to applicants who took the Civil Service Examination and were hired after plaintiff was not hired. (Tr. 3.) Plaintiff in turn objected to defendants' introduction of evidence as to a candidate who took the Civil Service Examination two years prior to plaintiff. (Tr. 65.) At trial, the Court decided to receive the parties' respective offers of proof and reserved decision on the weight to accord them. (Id.) In Di Cola v. Swissre Holding (North America), Inc., No. 90 Civ. 3211(MJL), 1992 WL 197403, at *5 (S.D.N.Y. Aug.5, 1992), aff'd 996 F.2d 30 (1993), the court determined as a matter of law that events post-dating plaintiff's termination by three years were irrelevant. In the instant case, all of the evidence proffered by the parties took place within three years of the time during which plaintiff was in the application process. We note that unlike the plaintiff in Di Cola, who was terminated, this case is one in which applicants went through a lengthy process, often lasting years, before a decision on their employment was made. Accordingly, we hold that the disputed evidence is relevant and admissible.

mission stating that Lombardo was fit to be a police officer, (*id.*), and Lombardo was appointed in 1989. (Defs.Ex.O.)

Other police officer candidates overcame the weight restrictions by submitting a note from their personal physician certifying that their excess weight was due to "lean body mass." For example, Thomas Strauss, who applied to be a police officer in 1987, was found to be five feet, ten inches tall and 208 pounds with a large body frame. The guidelines provided that the maximum weight for an individual with these measurements was 201 pounds. (Defs.Ex.HH.) Strauss submitted a note from his physician stating that "his weight is over that allowed on weight chart due to lean body mass. Secondary to weight lifting and athletic training." (*Id.*)

Likewise, Michael LaRotundo, who applied in 1983, was found to be five feet, eight inches tall and 192.5 pounds with a large frame. Based on these measurements, he was determined to be over the guidelines provided by the state. (Pl.Ex. 27; Defs.Ex. GG.) However, LaRotundo provided a note from his physician dated February 1985 stating that the "excess weight was due to lean body mass." (*Id.*) LaRotundo subsequently was certified for appointment. (Tr. 132.)

John Arcuri, who qualified for appointment in September 1989, was found to be five feet, eight inches tall and 194 pounds with a medium frame. (Pl.Ex. 1; Defs.Ex. CC.) Based on these measurements it was determined he was in excess of the guidelines. However, Acuri provided the Commission with a note from a physician stating that he had "slight excess weight due

to lean body mass secondary to weight training and is acceptable." (Pl.Ex. 19; Defs.Ex. CC.)

Rocco Capoccia was found to be five feet, ten and one-half inches tall and 230 pounds with a large frame. Based on these measurements, he was in excess of the guidelines. Capoccia was informed by letter that if he did not lose the necessary weight, he could not be certified for appointment. (Defs.Ex.EE.) [3] Capoccia subsequently provided the Commission with a stress test indicating his fitness for the position.[4] (Defs.Ex.EE.)

David Urban, who was measured at five feet, ten inches and who weighed 193 pounds, was appointed a police officer on May 20, 1989 after the Commission's examining physician certified on April 22, 1989 that his "excess weight [was] due to lean body mass from exercise." (Pl. Ex.25.)

Several male candidates who took the October 29, 1983 Civil Service Examination with plaintiff failed to meet the weight guidelines set by the Municipal Training Council and were not certified by the Commission as eligible for consideration to be hired as a police officer.

Thomas Gannon took the Civil Service Examination on October 29, 1983. Gannon was ranked number sixteen on the Civil Service Non–Resident List. (Defs.Ex.L.) Gannon was not certified by the Commission to be considered for appointment to the position of police officer in the City because he was overweight. (Defs.Ex.L.) Neither Hodgins nor Roque advised Gan-

---

**3.** Plaintiff brought out at trial that on the Commission's file copy of the January 4, 1985 letter to Capoccia, Hodgins had written a note that stated "stress test set for Wed. Jan. 9th tentative." (Defs.Ex.EE.) Plaintiff claimed that Hodgins' handwritten notation was evidence that Hodgins made the appointment for Capoccia's stress test herself. However, Hodgins testified at trial that she could not recall her conversation with Capoccia regarding his stress test, but that she did not schedule the stress test because that was not her practice. (Tr. 154–55.)

**4.** Capoccia, a non-resident of the City, had his medical examination in January 1985, before plaintiff had hers in August of 1985, despite the fact plaintiff was a resident, and thus entitled to priority. Hodgins explained that at the time, Cappoccia had a valid New York driver's license and plaintiff did not. (Tr. 141–42.) The examination notice specifically provided that "[t]o be eligible for appointment, candidates must possess a valid New York State Driver's License." (Defs.Ex. A at 2; Tr. 148, 171.)

non of the stress test option. (Tr. 53, 162–63.)

Ricardo James also took the Civil Service Examination on October 29, 1983. James was ranked twenty-ninth on the Civil Service Resident List. (Defs.Exs.K, L.) James was not certified by the Commission for consideration to be appointed to the position of police officer because he was overweight. (Defs.Ex.L.) Neither Hodgins nor Roque informed James of the stress test option. (Tr. 56, 162–63.)

During the course of the trial, plaintiff admitted into evidence the records of a number of individuals who passed the medical and physical requirements of the job. Each of these individuals met the height and weight requirements established by New York State.

Sixteen of the female applicants who took Civil Service Examination No. 66–487 passed the written and agility tests. Two of these sixteen women, Karyn Addison and Theresa Lisella, were appointed as City police officers. (Defs.Ex.L.)

Subsequent to May 21, 1986, when plaintiff's eligibility list expired, plaintiff did not apply for a police officer position in any other community. Plaintiff testified as follows:

Q. Since [May 21, 1986], have you taken any other Civil Service Tests for the police officer's position?

A. No.

Q. And since that time, have you applied for a police officer position, either in Mount Vernon or any other police jurisdiction in Westchester County?

A. No.

(Tr. 19.)

Since 1986, plaintiff has been employed as a legal secretary. (Defs.Ex. X; Tr. 19–20.) Plaintiff did not seek work as a police officer in another jurisdiction because she wanted to work in the town in which she lived and where her children went to school. Plaintiff testified: "I felt like I could be an asset to my town." (Tr. 23–24.)

In August 1986, plaintiff filed a charge of discrimination with the New York State Division of Human Rights. On February 26, 1999, plaintiff commenced this action by filing a complaint in the United States District Court for the Southern District of New York.

## CONCLUSIONS OF LAW

### I. *Shifting Burdens of Proof*

The disposition of an employment discrimination action follows the three-step procedure set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–05, 93 S.Ct. 1817, 1822, 1824–26, 36 L.Ed.2d 668 (1973).[5] First, the aggrieved employee bears the burden of establishing a prima facie case of discrimination. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824. This burden is a light one. *See Chertkova v. Connecticut Gen. Life Ins. Co.,* 92 F.3d 81, 87 (2d Cir.1996). If the plaintiff successfully establishes a prima facie case, there is a rebuttable presumption of discrimination and the burden of going forward then shifts to the employer to articulate some legitimate, non-discriminatory reason for the action. *McDonnell Douglas,* 411 U.S. at 803, 93 S.Ct. at 1824; *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 1094–95, 67 L.Ed.2d 207 (1981). If the employer·does so, the presumption of discrimination "simply drops out of the picture," *St. Mary's Honor Ctr. v. Hicks.,* 509 U.S. 502, 511, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993), and the plaintiff must show that it is more likely than not that the employer's actions were motivated, at least in part, by discrimination. *See Stratton v. Department for the Aging for the City of New York,* 132 F.3d 869, 879 (2d Cir.1997). "[A] plaintiff's prima facie case,

---

5. Courts employ the same Title VII analysis for claims brought pursuant to the New York State Human Rights Law. *Song v. Ives Labs.,* *Inc.,* 957 F.2d 1041, 1046 (2d Cir.1992). Thus, this discussion shall apply equally to plaintiff's state law claim.

combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves v. Sanderson Plumbing Prods., Inc.*, — U.S. —, —, 120 S.Ct. 2097, 2109, 147 L.Ed.2d 105 (2000).

## II. *Plaintiff's Title VII Claim*

Plaintiff's claims are grounded in Title VII. Under § 703(a) of Title VII:

> It shall be an unlawful employment practice for an employer—(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e–2(a).

To make out a prima facie case for disparate treatment under Title VII, the "plaintiff must prove by a preponderance of the evidence that she applied for an available position for which she was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination." *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1092. The burden of establishing a prima facie case is de minimis. *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir.1994). The prima facie elements are "not intended to become rigid or mechanical, but rather 'to promote the general principle that a Title VII plaintiff must carry the initial burden of offering evidence adequate to raise an inference of discrimination.'" *Eng v. Banco Di Sicilia*, 1998 WL 159062, No. 95 Civ. 3868(DAB), at *2 (S.D.N.Y) (quoting *Meiri v. Dacon*, 759 F.2d 989, 996 (2d Cir.1985)); *see also Brown v. Coach Stores, Inc.*, 163 F.3d 706, 709–10 (2d Cir.1998) (noting that the nature of the prima facie proof required in a Title VII case may vary according to the facts of that particular case).

Plaintiff alleges that she received disparate treatment as compared to that accorded similarly-situated males and was targeted for such adverse treatment because of her gender in that: (1) she is a woman who passed the police officer's written and agility tests and ranked thirty-five on the resident eligibility list in May 1984, (Complt.¶¶ 1, 2); (2) she was informed after her September 5, 1985 medical examination that she was fifteen pounds overweight, and subsequently lost some of the weight, (Complt.¶ 2); (3) similarly-situated men were appointed although they were more overweight than plaintiff, (Complt. ¶ 8); and (4) she was not given a stress test to determine if she met eligibility standards despite her weight, as was done for other applicants, (Complt.¶ 9).

Defendants argue that plaintiff has not made out a prima facie case because she failed to meet the height/weight requirement and thus was not "qualified" for the position of police officer. Plaintiff counters that but for defendants' discriminatory acts, she would have met the height/weight requirement.

In support of their position, defendants cite *Kofer v. Village of Pelham*, 710 F.Supp. 483 (S.D.N.Y.1989). In *Kofer*, the court determined that a thirty-one-year-old woman who scored the highest of all applicants on a 1983 written Civil Service Examination and who met the residency, education and physical agility qualifications, but who nonetheless was passed over for a position as police officer, did not make out a prima facie case of sex discrimination. The state civil service law, which the Second Circuit had ruled was constitutional before the plaintiff brought her claim, provided that police officer candidates had to be between the ages of twenty and twenty-nine. *Id.* at 484. Accordingly, the court found that the plaintiff was not qualified for the position based upon her age, and thus was unable to make out an essential element of her claim. *Id.*

The case at bar is distinguishable from *Kofer* in that plaintiff here alleges there were exceptions made to the height/weight requirements set by the Municipal Training Council such that men who were more overweight than plaintiff became eligible

for hiring either because their examining physician ascribed their excess weight to "lean body mass" or they were given a stress test—opportunities plaintiff claims the Commission denied her.

The posture of this case is somewhat unusual. Whether or not plaintiff has set forth a prima facie case of discrimination turns on whether defendants' reasons for failing to qualify her as a candidate were pretextual. The *McDonnell Douglas* burden shifting analysis "is not a rigid ritual, but simply an orderly way to evaluate proof when discrimination is claimed." *Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1112 (2d Cir.1988). Accordingly, we will presume, for purposes of analysis, that plaintiff met her initial burden and proceed to the core issue of whether plaintiff has shown it more likely than not that her gender "actually played a role in the employer's decisionmaking process and had a determinative influence on the outcome." *Reeves,* —— U.S. at ——, 120 S.Ct. at 2105 (internal citations and quotations omitted). *See Shafrir v. Association of Reform Zionists of Am.,* 998 F.Supp. 355, 360 (S.D.N.Y.1998) (Chin, J.) (assuming the existence of a prima facie case and moving to the "ultimate issue" of "whether the plaintiff has proven that it is more likely than not that the employer's decision was motivated at least in part by an 'impermissible,' or discriminatory, reason").

As stated above, the Commission's physician found that plaintiff had a medium frame, that she weighed 170 pounds, and that she was five feet, five and one-half inches tall. Plaintiff conceded at trial that at no time prior to the expiration of the eligibility list did her weight fall within the guidelines, or within the twelve-percent cushion allowed by the Municipal Training Council. However, plaintiff introduced evidence at trial that several men who were overweight were nonetheless certified as eligible for appointment based on the results of a stress test or a designation by their examining physician that their excess weight was due to "lean body mass." At least one of those men was diagnosed with obesity. Certainly, plaintiff's suspicions

reasonably were aroused as to the Commission's motives for failing to certify her for appointment when overweight men, one of whom exceeded the weight requirements by almost ninety pounds, were certified and appointed.

■ However, a reasonable suspicion is insufficient to impose liability on defendants and plaintiff's case amounts to no more than that. Plaintiff offered no evidence that any individual was informed by defendants of his or her right to take a stress or fitness test. In fact, two long-standing Commission staffers testified that they never informed an applicant of the stress test option. Furthermore, plaintiff testified at trial that she was "pretty sure" she read the medical examination form before signing it, which stated that "[i]f weight is over or under the acceptable weight shown in the tables by an excess of 12%, attach results of additional stress and fitness tests pursuant to page 5 of the standards." Plaintiff said that she did not ask defendants about the stress test mentioned in the document. There was no evidence defendants concealed from plaintiff the option of a stress or fitness test; indeed, a female applicant did so the year before plaintiff applied to take the Civil Service Examination.

The only applicant who took a stress test and testified at trial, Joseph Radzinski, said that he knew of the stress test option because he had been a New York City police officer and took a stress test to overcome the weight requirement when he was hired by that department. Radzinski said that no one from the Mount Vernon Police Department told him of the stress test option.

In sum, plaintiff has failed to prove by a preponderance of the evidence that her gender played any role in defendants' failure to hire her. We sympathize with plaintiff, who lost a possibility opportunity to become a Mount Vernon police officer because of her lack of knowledge of the stress test alternative, and we might wish that the Commission officials made sure

that all overweight applicants were aware of it. However, "even if the employer acted unwisely or erroneously," there is no proof of gender discrimination in this case. *See Toliver v. Sullivan Diagnostic Treatment Ctr.*, 818 F.Supp. 71, (S.D.N.Y.1993), *aff'd*, 22 F.3d 1092 (2d Cir.1994) (TABLE), *and cert. denied*, 513 U.S. 1151, 115 S.Ct. 1103, 130 L.Ed.2d 1070 (1995).

## CONCLUSION

For the forgoing reasons, we find in favor of defendants on all counts. The Clerk of the Court shall enter judgment for defendants. Each party shall bear it own costs.

SO ORDERED.